Irma **DREILING**, widow of Leo McLelland, Plaintiff-Appellant,

v.

**GENERAL ELECTRIC COMPANY,** Defendant-Appellee.

No. 73–3572.

United States Court of Appeals, Fifth Circuit.

April 18, 1975.

Fernand F. Willoz, III, New Orleans, La., for plaintiff-appellant.

William A. Porteous, III, Geoffrey H. Longenecker, New Orleans, La., for defendant-appellee.

Before SIMPSON, CLARK and RONEY, Circuit Judges.

SIMPSON, Circuit Judge:

Following a jury verdict for the defendant, General Electric Company (GE), the trial judge denied the unsuccessful plaintiff-appellant's alternative motions for judgment n.o.v. or for a new trial. Mrs. Dreiling appealed. We fail to find reversible error demonstrated in the denial of her post-trial motions and accordingly affirm the judgment appealed from.

The suit was based upon a claim of products liability for damages sustained by the plaintiff arising when she was required to undergo surgery to replace an allegedly defective heart pacemaker[1] manufactured by GE. Jurisdiction was based on diversity of citizenship between the plaintiff, a Louisiana citizen and GE, a New York corporation.

## THE FACTS

In November 1971 the plaintiff, Mrs. Irma McLelland—since remarried and now known as Mrs. Irma Dreiling (Mrs. McLelland hereinafter, as she was referred to below)—underwent an operation in which a heart pacemaker was implanted in her chest to provide stimuli for maintenance of her heartbeat during periods of intermittent breakdown. The device was a transvenous standby type pacemaker manufactured by GE.[2] Mrs. McLelland suffered some difficulties with the pacemaker leading to a second operation in February 1972.[3]

In early April 1972, her cardio-vascular surgeon, Dr. Freeman, received a "Product Safety Warning" letter from GE. The letter was transmitted to all physicians who had purchased pacemakers of

---

1. Technically, an Implantable Pulse Generator, Serial No. 871258, but commonly known and referred to throughout the proceedings in the district court as a pacemaker, or heart pacemaker.

2. A standby pacemaker is a type that does not constantly stimulate the heart to beat at a prescribed rate. Rather, the standby device employs sensing electrodes implanted either within or on the outside walls of the patient's heart to determine whether the heart is spontaneously beating at the prescribed rate. Only when the sensing electrodes perceive that the heart is beating at below the proper rate do they signal the pacemaker to begin operation. The pacemaker then electrically stimulates the heart to beat at the proper rate until such time as the sensing electrodes determine that the heart has resumed its normal functioning, when the device reverts to standby status.

Pacemakers utilizing electrodes implanted within the heart are termed transvenous or endocardial while those with electrodes attached to the exterior heart wall are termed epicardial.

3. Examination of Mrs. McLelland upon her readmission to the hospital revealed intermittent malfunctioning of the pacemaker. Her attending physician, Dr. James M. Freeman, a cardio-vascular surgeon, attributed this to poor contact between the electrodes and the interior of Mrs. McLelland's heart. He performed a second operation in mid-February 1972 to reposition the electrodes within Mrs. McLelland's heart.

At trial, Dr. Freeman testified that, in retrospect, he considered that the malfunction in the pacemaker may have been attributable to a defect in the pacemaker itself. He based this conclusion on two observations: (i) that the malfunction was intermittent, and (ii) that the malfunction manifested itself months rather than days following the operation—a pattern unusual in cases of poor electrode contact with the heart wall. However, there was evidence that the pacemaker in fact functioned properly after repositioning of the electrodes.

a specific production group manufac-
tured by GE during the summer of 1971.

According to the warning, reproduced in
full in the margin,[4] a small percentage

**4.** The letter from GE was as follows:

GENERAL ELECTRIC COMPANY • MEDICAL SYSTEMS DIVISION • 4855 ELECTRIC AVENUE,
MILWAUKEE, WISCONSIN 53201 • AREA CODE 414-383-3211

April 1, 1972

James Freeman, M.D.
2700 Napolean Hospital
New Orleans
Louisiana 70125

### PRODUCT SAFETY WARNING

PROBLEM

A small number of GE implantable Standby Pacemaker pulse generators
(Catalog No. A2072) in a specific production group manufactured by us in the
summer of 1971 may develop an anomalous mode of operation characterized
by an increase in the pacing rate above that which may normally occur with
these generators from an increase in heart load impedance.

In certain cases, this anomalous mode of operation can develop relatively rap-
idly, within a period of 24 to 48 hours.

Standby pulse generators manufactured before or after this specific production
group have not developed this anomalous mode of operation.

PATIENT INFORMATION

Although we expect that only a small percentage of the Standby pulse genera-
tors manufactured in this specific production group have the potential to de-
velop this anomalous mode of operation, we cannot identify precisely which
units are involved.

Attached to this letter is a sheet listing all of the Standby pulse generators
(Catalog No. A2072) reported to have been implanted by you, from this pro-
duction group.

ACTION

In order to assure a minimum hazard for the patients under your care, we
recommend that you consider prompt replacement of the pulse generator in
these patients.

Until you are able to replace the pulse generator, please instruct your patients
to monitor their pacemaker's pacing rate with a GE Pacemaker Sensor, or at
minimum with an AM transistor radio, twice daily and inform you of any
change in the pacemaker's rate which is in excess of 10 beats per minute above
the normal pacing rate so that you can act immediately if necessary.

REIMBURSEMENT

The replacement generator will be supplied at no charge. In addition, the
General Electric Company will reimburse the reasonable medical and surgical
costs associated with replacement of the generators listed on the attached
sheet, providing it is replaced with another General Electric generator.

To qualify for reimbursement, return the removed generator with the registra-
tion form for the replacement generator to:

W. H. Duehren, Manager
Pacemaker Products
General Electric Company
4855 Electric Avenue
Milwaukee, Wisconsin 53201

The bills for the associated medical and surgical services will be honored if
received within 90 days of the date of this letter. The bills should be mailed
to the above address and should identify the generator removed (serial number)
and the patient.

of the pacemakers from this production group, individually unidentifiable, had the potential to develop an "anomalous mode of operation characterized by an increase in pacing rate above that which may normally occur with these generators . . ." GE recommended immediate replacement of the generators and offered to bear the cost of replacement, including the replacement pacemaker and hospital and surgical costs, provided that: (i) replacement was with another GE pacemaker and the removed pacemaker was returned to GE, and (ii) bills for replacement costs were submitted within 90 days of the date of the warning letter.

Based on the warning notice, Dr. Freeman advised and Mrs. McLelland consented to a third operation to replace the transvenous type pacemaker with an epicardial type unit. Dr. Freeman recommended the switch in pacemaker types because Mrs. McLelland's skin had not completely healed from the two earlier operations. The surgical procedure required for implantation of the epicardial pacemaker was a thoracostomy, described by Dr. Freeman as "an incision that's made beneath the breast between the ribs, you have to spread the ribs and sew the electrode onto the heart, and then place a pulse generator or batteries beneath a different pocket and sew up the incision." Aside from the additional scarring of Mrs. McLelland's chest, the physical difficulties occasioned by the third operation were: (i) pleural effu-

sion, described as "a collection of fluid between the lungs and the chest wall in the left chest, which required inserting a needle and aspirating the fluid", and (ii) post-operative sensitivity in the area of the surgical incisions, which was described as a normal consequence of a thoracostomy. Mrs. McLelland encountered no apparent problems of malfunction with the epicardial pacemaker implanted during the third operation.

The transvenous pacemaker which was removed from Mrs. McLelland's chest was returned to GE in accordance with the provisions of the warning letter. GE placed the pacemaker on a test bench where it was operated continuously and without malfunction at least until the time that this case was tried. As it undertook to do by the warning letter, Note 4, supra, GE paid the medical, surgical and hospital bills for the replacement of Mrs. McLelland's pacemaker.

### THE TRIAL

Mrs. McLelland's complaint asked damages of $150,000 for pain and suffering occasioned by the operation to replace her transvenous type pacemaker and for her claimed disability, disfigurement, and scarring resulting from that operation. She asserted that the pacemaker was defective and unfit for the use for which it was intended and that GE was liable to her for damages for (i) breach of implied warranty, (ii) under

We regret the necessity of this communication but believe it is part of the obligation you normally expect from General Electric as a major medical equipment manufacturer.

Your comments, questions and suggestions regarding this change in our recommended action are welcome. Please call me COLLECT: 414–383–3211, Extension 7404.

Sincerely,
(s) W. H. Duehren,
W. H. Duehren, Manager
Pacemaker Products
CARDIO–SURGICAL SYSTEMS

WHD:dg
Attachment

the doctrine of res ipsa loquitur, and (iii) under concepts of strict liability.[5]

GE defended by denying (1) that it had been negligent in manufacturing the pacemaker or (2) that the pacemaker was defective. As to its non-negligence, GE produced testimony to the effect that the pacemaker had been manufactured with all possible human skill and caution and that GE, therefore, could not be found negligent. As to whether the pacemaker was defective and GE was accountable under a strict liability theory for damages flowing from such defect, GE pointed to the pacemaker's continued operation without signs of malfunction after removal from Mrs. McLelland's body as evidence that the pacemaker was not defective, either in the ordinary technical sense of mechanical fault or under a more refined theory of carrying the potential to develop an anomalous mode of operation, i. e., to develop harmful aberrations in use.

The case was tried before a jury and submitted for decision on special interrogatories. F.R.Civ.P. 49(a), framed as follows:

| Interrogatory | Unanimous Answers of the Jury |
|---|---|
| 1. Was General Electric Company Negligent? | Yes_____ No_____ |
| 2. Did the Pacemaker have a defect at the time General Electric sold it? | Yes_____ No_____ |
| 3. What is the total amount of damages suffered by Mrs. McLelland? | $_____ (Total amount of damages) |

The jury answered questions numbered 1 and 2 in the negative and found that Mrs. McLelland was entitled to no damages.

The plaintiff timely moved for judgment n.o.v. and, in the alternative, for new trial. Each motion was based upon claimed insufficiency of the evidence to support the jury verdict. The new trial motion alleged in addition that the jury verdict was contrary to the law and that the form of special interrogatory employed by the trial court deprived the

---

**5.** The case was submitted to the jury, with the plaintiff's approval, on two theories: (i) negligence, and (ii) strict liability. It appears that the claim for breach of warranty, to the extent not embraced in the strict liability concept, was abandoned at trial.

Because the careful and informed handling of the case by the able trial judge distilled and clarified the issues for trial, and in turn left little room on appeal for complaint as to legal theories followed at trial, we are not faced here with the battery of complicated issues ordinarily accompanying appeals in diversity cases tried under theories of strict liability or implied warranty as to manufacturers. See for example: Welch v. Outboard Marine Corp., 5 Cir. 1974, 481 F.2d 252; Helene Curtis Industries, Inc. v. Pruitt, 5 Cir. 1967, 385 F.2d 841, cert. denied 1968, 391 U.S. 913, 88 S.Ct. 1806, 20 L.Ed.2d 652; Green v. American Tobacco Co., 5 Cir. 1962, 304 F.2d 70; petition for rehearing granted to extent of certifying question, 5 Cir. 1962, 304 F.2d 85; certified question answered, Fla.1963, 154 So.2d 169; opinion following answer to certified question, 325 F.2d 674 (1963), cert. denied 1964, 377 U.S. 943, 84 S.Ct. 1349, 12 L.Ed.2d 306 and 377 U.S. 943, 84 S.Ct. 1351, 12 L.Ed.2d 306; 391 F.2d 97 (1968), overruled en banc 409 F.2d 1166 (1969), cert. denied 1970,

397 U.S. 911, 90 S.Ct. 912, 25 L.Ed.2d 93; Lartigue v. R. J. Reynolds Tobacco Co., 5 Cir. 1963, 317 F.2d 19, cert. denied 375 U.S. 865, 84 S.Ct. 137, 11 L.Ed.2d 92.

As indicated earlier in this Note the second issue submitted to the jury was that of strict liability. The concept followed was that set forth in Restatement of Torts, Second, Sec. 402(A), and particularly Comment g and Comment k thereto. As pointed out by Judge Rubin in his extensive August 15, 1973 memorandum order denying the motions for judgment n.o.v. and for new trial, App. pages 21–36: "[T]his (the Restatement Sec. 402(A) concept) appears to be Louisiana doctrine", citing authorities including LeBlanc v. Louisiana Coca-Cola Bottling Co., 1952, 221 La. 919, 60 So.2d 873; Malone, Faculty Symposium on the Work of the Louisiana Supreme Court, 1952–53 term, 1953, 14 La.L.Rev. 183; Brown, Note, 1953, 13 La.L.Rev. 624; Jumonville, Comment, Liability on Damages Resulting from Consumption of Deleterious Foodstuffs in Louisiana, 1962, 22 La.L.Rev. 435; McCowan, Note, 1966, 26 La.L.Rev. 447; and Weber v. Fidelity & Cas. Ins. Co. of N. Y., 1971, 259 La. 599, 250 So.2d 754, and Judge Wisdom's penetrating analysis of Weber in Welch v. Outboard Marine Corp., supra.

jury of a chance to consider fully the complex liability issues involved in the case. The district court, in an unpublished but elaborate and meticulously reasoned memorandum order dated August 15, 1973, denied both motions and entered judgment for GE. This appeal followed.

## ISSUES ON APPEAL

1. *The Special Interrogatory Form.* The plaintiff submits that the trial judge erred in striking from the special interrogatory form what had been originally proposed as Interrogatory # 3. This interrogatory asked: "At the time General Electric made it, did the Pacemaker have a potential for an anomalous mode of operation such that its actual properties could not have been known without an operation?" [6] The plaintiff asserts that, absent proposed Interrogatory # 3, the interrogatory form "confused the jury as to the actual issues presented, to such an extent that it could not render a verdict in conformance with the law as charged by the Court.[7]

Our decisions make clear that both the initial question of whether to employ special interrogatories and the secondary question of how those interrogatories are to be framed are matters within the sound judicial discretion of the trial judge. Abernathy v. Southern Pacific Co., 5 Cir. 1970, 426 F.2d 512, 514; Grey v. First National Bank in Dallas, 5 Cir. 1968, 393 F.2d 371, 385, cert. denied 1968, 393 U.S. 961, 89 S.Ct. 398, 21 L.Ed.2d 374. The corollary is that our review of a trial court's use of spe-

cial interrogatories is confined to deciding whether such use was an abuse of discretion. *Abernathy*, supra.

In prior cases we have emphasized several factors in determining the adequacy of forms of special interrogatories: (i) whether, when read as a whole and in conjunction with the general charge the interrogatories adequately presented the contested issues to the jury, Merchant's Fast Motor Lines, Inc. v. Lane, 5 Cir. 1958, 259 F.2d 336, 339, cert. denied 1959, 359 U.S. 935, 79 S.Ct. 651, 3 L.Ed.2d 636; (ii) whether the submission of the issues to the jury was "fair", Travelers Insurance Co. v. Truitt, 5 Cir. 1960, 280 F.2d 784, 789; and (iii) whether the "ultimate questions of fact" were clearly submitted to the jury, *Id.* Balanced against these standards, the special interrogatories used were adequate, and we perceive no error in the trial court's withholding submission to the jury of its proposed Interrogatory # 3.

The two theories of recovery pressed by the plaintiff in the trial below and on appeal were (i) negligence and (ii) strict liability based on the alleged defect in the pacemaker. The questions of negligence and defectiveness *vel non* of the pacemaker—the plaintiff's ultimate factual theories of liability—were concisely stated in the special interrogatory form submitted to the jury. Whether the pacemaker had a potential to develop an anomalous mode of operation was a penultimate question adequately covered in the court's general

6. In addition to striking Proposed Interrogatory # 3, the trial court also struck its original Proposed Interrogatory # 4, which read: "Was it possible for General Electric using the utmost care and skill to have made a Pacemaker at the time it made the one first installed in Mrs. McLelland that would have functioned without a potential for an anomalous mode of operation?" Both interrogatories, which had been prepared by the trial court, were stricken on motion by counsel for the defendant GE on grounds of redundancy. The trial court concluded that the main issues as to liability were properly stated in Interrogatories # 1 and 2. The court decided to instruct the jury on the substance of the

stricken Interrogatories 3 and 4 and include in the written interrogatories to the jury only the ultimate questions to be decided.

7. It should be noted that the plaintiff did not assert that the case had been submitted by the trial court to the jury under an incorrect theory of law. She conceded both to the trial court and before this court in oral argument that the jury had been properly charged as to the law. Her complaint was in essence that the law was so complex that assistance in the form of additional interrogatories was necessary for the jury to decide the case according to correct principles of law.

charge. The trial judge charged the jury:

It's for you to decide whether or not the pacemaker was defective.

In deciding this, you should consider whether the pacemaker in fact had the potential for developing what you have heard called as an anomalous mode of operation. If the pacemaker with such a potential is considered by you to be defective, and it was impossible to determine whether it was safe for use or not safe for use without an operation, then G.E. is liable for that operation and any damages occasioned thereby. (Transcript at 153).

Taken in conjunction with the interrogatories as submitted, this language fairly informed the jury of the basis upon which they could find the pacemaker to have been defective.

Mrs. McLelland insists on appeal however that the instruction quoted above "was buried in with so many technical definitions of 'defect' that it was impossible even for counsel to follow when recited by the Court". (Appellant's brief at p. 17). We do not so view the charge and the accompanying interrogatories.

There were several ways in which the trial court could have structured its use of the special interrogatories in conjunction with its general charge to the jury. Not all judges and few trial lawyers would be apt to agree on the "best" interrogatories and jury charge. But we may not substitute our judgment as to the best choice for the decision in that respect of the trial judge. We limit our review to determining whether his choice satisfied the standards alluded to above. We find here substantial compliance with those principles. Abuse of discretion in this respect is not demonstrated.

■ 2. *Sufficiency of the Evidence.* The plaintiff urged in her motion for judgment n.o.v. (and in her motion for new trial as well) that under the doctrine of absolute liability and under the evidence in the case she was entitled to judgment as a matter of law.[8] We review this contention under the principles we promulgated in Boeing Co. v. Shipman, 5 Cir. 1969, 411 F.2d 365 (en banc):

On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury.

411 F.2d at 374. Viewing the evidence under these standards, we conclude that reasonable men might differ as to the correct answers to the interrogatories propounded by the trial court.

■ On the negligence issue, GE introduced substantial testimony regarding the care with which it manufactured its heart pacemakers. GE's evidence was to the effect that its production methods represented the most advanced procedure possible under the current state of the art. As the trial court noted regarding the pacemaker assembly process:

It requires about two weeks to assemble this intricate life saving appliance. Its parts are put together on an assembly board by a single industrial worker. All units are energized throughout the production process so

---

8. She made this argument both in her motion for judgment n.o.v. and in her motion for new trial. Additionally the plaintiff asserted in her motion for new trial that the jury verdict was contrary to law. In the light of appellant's concession that her case was submitted to the jury under a correct theory of law, we equate this ground with the complaint that the evidence was insufficient to support the jury's findings, and treat it accordingly.

that short circuits or defective connections can be instantly detected. The unit's batteries are installed just before the unit is sealed so as to assure the longest possible battery life. Then to avoid corrosion and absorption of body fluids, the unit is filled with an epoxy plastic so that it is a single solid. Finally, the unit is tested for a period of several weeks. It is then ready for surgical installation in the human body.

Reasonable men might differ as to whether in the light of this evidence, GE had been negligent in the manufacture of Mrs. McLelland's pacemaker.

■■■■■ As to the strict liability question of whether the pacemaker was defective, GE introduced, in addition to its evidence regarding the care and skill with which the pacemakers were manufactured, evidence showing that once the pacemaker was completely assembled and sealed it became impossible to inspect the internal mechanism for defects without completely destroying the pacemaker itself. In our considered judgment there was ample evidence upon which the jury could reasonably resolve the defect issue in the defendant-appellee's favor.[9]

In sum, because the evidence on both the negligence and defect issues was of such a character that the jury could reasonably find for the defendant, denial of the plaintiff's motion for judgment n.o.v. was not error under the standard of Boeing Co. v. Shipman, supra.

■■■■■ We determine finally that the denial of Mrs. McLelland's motion for new trial was not error. It is well-established in this circuit that the decision to grant or deny a motion for new trial is entrusted to the sound judicial discretion of the district court. Urti v. Transport Commercial Corp., 5 Cir. 1973, 479 F.2d 766, 768. We will reverse only where the district court has failed to exercise its discretion or in its exercise has abused that discretion. Faircloth v. Lamb-Grays Harbor Co., 5 Cir. 1972, 467 F.2d 685, 697; Marsh v. Illinois Central R. Co., 5 Cir. 1949, 175 F.2d 498, 499–500. See also Woods Exploration & Producing Co. v. Aluminum Company of America, 5 Cir. 1975, 509 F.2d 784, at p. 792, note 3 and accompanying text. Based on our study of the trial record and our consideration of the substantive points raised by appellant in this court, we do not find error demonstrated in the denial of the new trial motion by the district judge.

The judgment appealed from is

Affirmed.

---

9. On the "state of the art" defense, the trial court instructed the jury:

> In this case, if you find that Mrs. McLelland's *continued use* of the original pacemaker supplied by G.E. involved a serious risk of injury to herself, and if, after its removal, even though it had no defect, no present defect, it still had a potential for developing a defect, then you should conclude that it was defective, *unless you find that the product was as safe as scientific knowledge could possibly make it.* (Transcript at 155; emphasis added).

In this connection the appellant asserts that the "state of the art" defense was an affirmative defense required to be specially pleaded under Rule 8(c), F.R.Civ.P. Since GE did not specially plead this defense, the plaintiff contends that it should be deemed to have been waived, and that the trial court committed reversible error when it permitted the jury to consider the defense.

In advance of oral argument the trial judge submitted its proposed jury instructions to counsel, in abundant compliance with Rule 51, F.R.Civ.P. Neither at that time nor after the delivery of the court's charge was any objection to the instructions raised by plaintiff's counsel. For this reason we decline to consider plaintiff's untimely contention that the "state of the art" was an affirmative defense required by Rule 8(c) to be pleaded specially. The objection should have been made when the trial judge could have considered it, viz: when the proposed instructions were submitted to counsel. Cf. SEC v. Dennett, 10 Cir. 1970, 429 F.2d 1303, 1304.