765 F.2d 144
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
CINCINNATI RIVERFRONT COLISEUM, INC., PLAINTIFF-APPELLANT,
CROSS-APPELLEE,
v.
CITY OF CINCINNATI, DEFENDANTS-APPELLEE, CROSS-APPELLANT,
CINCINNATI REDS; CINCINNATI REDS, INC. (CRI INC.), LOUIS
NIPPERT, W.J. WILLIAMS, JAMES R. WILLIAMS, DAVID
GAMBLE, J. BARRETT BUSE, ANDREW HOPPLE,
DEFENDANTS-APPELLEES, CROSS-APPELLANTS.
 NO. 84-3011, 84-3012, 84-3019
 United States Court of Appeals, Sixth Circuit.
 5/3/85
 
 ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO
 BEFORE: MERRITT and WELLFORD, Circuit Judges; and GILMORE*, District Judge.
 WELLFORD, Circuit Judge.
 
 
 1
 On February 15, 1967, the City of Cincinnati, defendant-appellee, entered into a 40-year lease with the Cincinnati Reds, also a defendant-appellee, whereby '[The Reds] shall have the right, during the Baseball Season, to the use of the entire Riverfront Stadium for its purposes at times herein defined.' The lease further stated: 'The [City] agrees to provide all parking spaces within the Parking Facilities during all Baseball Games for the use of patrons attending the games. At all other periods when the Parking Facilities are not so used, the [City] reserves the right to operate the aforementioned Parking Facilities on such basis as deemed feasible by the [City].' On November 29, 1967, the City entered into a nearly identical lease agreement with the owner of the Cincinnati Bengals football team.
 
 
 2
 In 1971 the City agreed to help the Cincinnati Coliseum Company (predecessor of plaintiff-appellant Cincinnati Riverfront Coliseum, Inc., hereafter 'Coliseum') with the development of a new indoor arena in the riverfront area. On January 15, 1974, the latter executed a lease with the City for the use of the stadium parking facilities. The lease provided:
 
 
 3
 Section 202. This lease is in all respects subject to the obligations of the City and the rights of other contracting parties and bondholders under the County Lease, the Stadium Leases, and Parking Trust Indenture.
 
 
 4
 * * *
 
 
 5
 * * *
 
 
 6
 Section 206. [The Coliseum] hereby covenants that, except with the prior written consent of the City Director of Public Utilities, it will not schedule any Arena Events, nor any other events at the Arena anticipated to require substantial parking which will commence earlier than one and one-half (1-1/2) hours following the reasonably expected time of completion of any stadium event . . . or which is not reasonably expected to conclude at least two (2) hours before the scheduled time of commencement of any stadium event . . .. Any consent by the Director under this section may be conditioned upon consent by the appropriate lessee under Stadium Leases and to assure that parking for attendance at the Arena will not interfere with parking in the Stadium Parking Facilities for any Stadium event.
 
 
 7
 (Emphasis added).
 
 
 8
 The Coliseum opened for business in the fall of 1975, and commencing in the Spring of 1976, the Coliseum scheduled simultaneous events without the consent of the Cincinnati Director of Public Utilities. The Reds immediately gave notice to the City that they 'expect you to have this [scheduling of simultaneous events] stopped before these conflicts reach the stage of embarrassment . . .. This can become a terribly severe matter for all concerned and unfairly [sic] for the Reds and for that matter the City.'
 
 
 9
 The City, in response to the Reds' complaints, wrote to the Coliseum:
 
 
 10
 Since the Coliseum lease is subject to the obligations of the City and the rights of the contracting parties under the Stadium leases (Section 202 Coliseum Lease), the [requirement that the City provide all parking spaces during all Baseball games for the use of patrons attending the games] must be met by the City. The discretionary power of the Director of Public Utilities set forth in Section 206 only applies during times not covered by the absolute requirement of all parking spaces being available during baseball games for baseball patrons. Therefore, no event at the Coliseum can be scheduled to be in progress during the playing time of any Reds game. The discretion allowed the Director is only applicable in the two (2) hour period prior to a Stadium event and in the one and one-half (1-1/2) hour period following such event. Consent is not necessary for events at the Coliseum ending prior to the two hour period or commencing after the one and one-half hour period. Consent cannot be given during the actual game itself.
 
 
 11
 (Emphasis added).
 
 
 12
 Despite this communication, the Coliseum expressed their intention to hold simultaneous events beginning June 12, 1976. The City, therefore, on June 11, commenced a declaratory action in Ohio state court against the Coliseum and the Reds to determine whether Section 206 of the Coliseum lease was valid and enforceable. The City sought a preliminary and permanent injunction restraining the Coliseum from holding simultaneous events that would violate the lease. On June 16, 1976, the state court granted the preliminary injunction.[1] On November 25, 1981, the state court further found the lease restriction valid and enforceable, and granted a permanent injunction prohibiting the Coliseum 'from scheduling or holding events at the Coliseum at any time or times which are prohibited by the said Lease between the City of Cincinnati and the Riverfront Coliseum, Inc.' The City claims that in its answer to the State declaratory action, the Coliseum pleaded as an affirmative defense that the lease section was an unlawful restraint of its business.[2]
 
 
 13
 After the City's declaratory judgment, the Coliseum commenced this private antitrust action in the district court charging that the City permitted the Reds to exercise a veto over whether to permit simultaneous events, and that this action violated the Sherman Act. The Coliseum contends that the City's and Reds' conduct constituted a group boycott and unreasonable restraint of trade, a monopoly, an attempted monopolization, and a conspiracy to monopolize.
 
 
 14
 The Coliseum adduced evidence showing that the Coliseum made 27 requests for simultaneous events with Reds games. On 22 of these occasions the City consulted with the Reds for permission to hold the event, and on each occasion the Reds refused consent and the City denied its permission. (On the other hand, on six occasions the Coliseum requested permission to hold events which overlapped with scheduled Bengals football games, with the latter's approval, the City granted the Coliseum permission). The Coliseum pointed out that the number of people parking at the Bengals games is about the same as the number of people parking at the Reds games and the City admitted that there were no undue problems with simultaneous events during Bengal games.
 
 
 15
 The Reds refused to permit the Coliseum to stage a 'test' simultaneous event to determine whether the problems and fears of the Reds were justified. The Reds feared that simultaneous events would adversely have an impact on their attendance.[3]
 
 
 16
 Issues in the case were submitted to a jury after experts testified on both sides concerning the relevant market and whether the actions of defendants might tend to be a monopoly or an illegal restraint of trade. The Reds throughout the proceedings insisted that they had a right to rely upon Sec. 206 and simply wanted their exclusive parking rights protected 'unhampered by needless if not dangerous crowd congestion and cross-traffic.' Reds' answer brief at 13). The City argued that the favorable state court decision in its action for declaratory judgment regarding the validity of Sec. 206 should constitute res judicata, and that the statute of limitations barred the action brought by the Coliseum.[4] The Reds strongly contested the Coliseum's characterization of the relevant market as to geography and product. Essentially the Coliseum contended that the large crowd entertainment market in the Greater Cincinnati Area was the proper standard for determining whether there were efforts and actions by defendants to monopolize and to restrain trade. The Reds, however, contended that entertainment generally in a market larger than Greater Cincinnati was the proper basis for measuring competition between the Reds and the Coliseum.
 
 
 17
 The court bifurcated trial as to liability on the merits of the antitrust claims from determination of damages, if any, and from the Coliseum's claim of fraudulent transfer and the City's counterclaim for material failure of consideration.[5] At the conclusion of the trial, the court conferred with counsel for the parties concerning instructions to the jury and suggested submission of issues pursuant to Rule 49(a) of the Federal Rules of Civil Procedure. All counsel, however, expressed reservations not only about this procedure but also about the proposed interrogatories to be submitted. As a consequence, the trial judge then proposed submitting the case on the basis of a general verdict pursuant to Rule 49(b), Fed. R. Civ. P.
 
 
 18
 Ultimately the district court determined to submit five special interrogatories, although there was considerable discontent, particularly with the first two relative to 'relevant market' and 'relevant product.' The City and the Reds argue that the Coliseum waived any objection to the first two,[6] but we believe this close question should be resolved in favor of the Coliseum after a careful examination of the record. The Coliseum concedes that its appeal 'focuses primarily on certain jury instructions and jury questions concerning 'relevant market." (Coliseum's brief at 4).
 
 
 19
 These three other special interrogatories were submitted to the jury:
 
 
 20
 QUESTION 3.
 
 
 21
 Do you unanimously find that the Defendants violated provisions, of Sherman 1 as described in Instructions 4102, 4103, 4104, 4105 and 4110?
 
 Yes _____
 No _____
 
 22
 QUESTION 4.
 
 
 23
 Do you unanimously find that either Defendant violated provisions of Sherman 2 as described in Instructions 4202, 4203, 4204, 4205, 4206, 4207 and 4220?
 
 A. City of Cincinnati:
 Yes _____
 No _____
 B. Cincinnati Reds:
 Yes _____
 No _____
 
 24
 QUESTION 5.
 
 
 25
 Do you unanimously find that the Defendants engaged in a group boycott as defined in Instruction 4111?
 
 Yes _____
 No _____
 
 26
 The jury answered each interrogatory favorably to the City and to the Reds; it found no 'relevant market' (Question No. 1), no 'relevant product' (Question No. 2), no violation as to 'Sherman 1' (Question No. 3), no violation as to 'Sherman 2' (Question No. 4), and no group boycott (Question No. 5). The Coliseum now asserts that the "market interrogatories' did not reflect a genuine issue of fact,' and thus tainted the entire process, entitling it to a new trial.
 
 
 27
 The Coliseum argues that the first two interrogatories placed in question what was, in effect, conceded by the City and the Reds (and the district court itself). The Coliseum contended that some relevant geographic and/or product market was evident; only the nature and extent of that market was in dispute. It points out the court's statement during the conference concerning the form of verdict and the court's instructions to the jury:
 
 
 28
 It is my understanding that there cannot be an antitrust violation unless you first prove that there is a relevant market. . . . so you must establish a relevant market, geographic and product.
 
 
 29
 * * *
 
 
 30
 * * *
 
 
 31
 There is a basic. concept that underlies the entire notice of antitrust. That's what is referred to as the relevant market.
 
 
 32
 * * *
 
 
 33
 * * *
 
 
 34
 First, you must determine whether defendants had substantial market power to unreasonably restrain trade in the relevant market.
 
 
 35
 * * *
 
 
 36
 * * *
 
 
 37
 In order to find a violation of Sherman 2, you must find that the defendants acquired or maintained sufficient power in the relevant market to give rise to a monopoly.
 
 
 38
 We cannot see that the asserted error, however, was the basis or cause of any prejudice to the Coliseum in this controversy. The Coliseum, in any event, failed to demonstrate any harm or any alleged inconsistency in the jury's findings and determinations, all of which were adverse to the Coliseum's contentions throughout the case.
 
 
 39
 The logical and reasonable interpretation of the jury's actions in this case are:
 
 
 40
 1) The Coliseum failed to prove any Section 1 or Section 2 Sherman Act monopoly violation by either defendant. (Instructions 3 and 4).
 
 
 41
 2) The Coliseum failed to prove any illegal group boycott by defendants. (Instruction 5).
 
 
 42
 3) The plaintiffs failed to prove its contentions concerning the nature and extent of the geographic and/or product market. (Instructions 1 and 2).
 
 
 43
 In accordance with these findings above summarized, the jury entered a general verdict for both defendants, having first answered 'no' to all five special interrogatories. We find no demonstrated inconsistency in the general verdict and the responses to the interrogatories, nor can we find that the Coliseum established that the jury instructions, taken as a whole, were erroneous.
 
 
 44
 The trial court has broad discretion under Rule 49 of the Federal Rules as to how the issues, particularly in an antitrust context, are to be submitted to a jury. Tennessee Cons. Coal Co. v. United Mine Workers, 416 F.2d 1192 (6th Cir. 1969); Dreiling v. General Electric Co., 511 F.2d 768 (5th Cir. 1975); Sperberg v. Goodyear Tire & Rubber Co., 519 F.2d 708 (6th Cir. 1975); J. C. Motor Lines v. Trailways Bus System, 689 F.2d 599 (5th Cir.1982). The answers to the special interrogatories in this case can be utilized reasonably to 'test' or 'shed light on' the general verdict rendered for the City and the Reds. Sakamoto v. N.A.B. Trucking Co., 717 F.2d 1000, 1005-1006 (6th Cir. 1983); Bahamas Agricultural Ind. v. Riley Stocker corp., 526 F.2d 1174, 1183 (6th Cir. 1975). At worst, the responses to Interrogatories 1 and 2 are irrelevant to the jury's decision otherwise that there was no demonstrated violation of the Sherman Act. Even if we were to deem the submission of interrogatories 1 and 2 and the responses thereto as not entirely consistent with the jury's general verdict for defendants, a finding we do not make, the general verdict would control under all the circumstances. Chesapeake & Ohio Railway v. Barnsky, 414 F.2d 309 (6th Cir. 1969); Gallick v. Bolt & Ohio Railway, 372 U.S. 108 (1963); Tenn. Cons. Coal Co., supra. The case relied upon by the Coliseum, Weingart v. Allen & O'Hara, Inc., 654 F.2d 1096 (5th Cir. 1981), is inapposite because the facts are entirely different and the jury's answers to interrogatories are not 'hopelessly inconsistent.'
 
 
 45
 In sum, we cannot agree that the interrogatories in question and the jury instructions given were shown to be confusing or misleading, or that there is inherent conflict in the jury's responses to the issues submitted to it. The Coliseum had a full and fair opportunity to make out its case, and we conclude that the jury's verdict for defendants should be sustained.
 
 
 46
 Accordingly, we AFFIRM the judgment below.
 
 
 
 *
 HONORABLE HORACE W. GILMORE, United States District Court for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 It is unclear whether the June 12 simultaneous event was actually held
 
 
 [2]
 This is relevant to both the City's and Reds' res judicata and collateral estoppel arguments. The joint appendix, however, does not seem to include a copy of the Coliseum's answer in the state case
 
 
 [3]
 This is evidenced by a letter written by a principal owner of the Reds to the Coliseum:
 I am sure you can understand their feeling in wanting to build up their attendance and not have anything interfere with this possibility. Their attendance has been falling due to a number of things, consequently, they want to strive to improve it as much as possible.
 
 
 [4]
 The City and the Reds moved for summary judgment based on the res judicata and statute of limitations defenses. These motions were denied by the district court
 
 
 [5]
 By an amended complaint the Coliseum charged certain individuals associated with the Reds of transferring certain assets of the corporation fraudulently in respect to the Coliseum's status as a potential creditor. The City amended its answer to claim material failure of consideration for its lease with the Coliseum
 
 
 [6]
 The first two interrogatories submitted to the jury, which are the basic source of controversy, are:
 Question 1: 'Do you unanimously find that there is a relevant geographic market as described in Instruction 4013?'
 Question 2: 'Do you unanimously find that there is a relevant product market as described in Instruction 4014?'