**TEX–GOOBER COMPANY,**
Plaintiff-Appellee,

v.

**LOS ANGELES NUT HOUSE, INC.,**
Defendant-Appellant.

No. 85–2688.

United States Court of Appeals,
Fifth Circuit.

Nov. 5, 1986.

Brian J. Hurst, David Ford Hunt, Dallas, Tex., for defendant-appellant.

Mark P. McMahon, Longview, Tex., Harold W. Nix, Daingerfield, Tex., for plaintiff-appellee.

Before GEE, RANDALL and DAVIS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

This is an appeal by a nut house in a lawsuit over peanuts. The dispute boils down to whether Spanish No. 1 peanuts should have been substituted for Spanish Jumbo peanuts. Because the trial judge failed to submit an interrogatory to the jury on the custom for substitution in this nutty business, we remand the case for additional findings of fact.

## I.

The Tex-Goober Company (Tex-Goober) agreed to sell 270,000 pounds of Spanish Jumbo peanuts to the Los Angeles Nut House (LANUT) at $.42 a pound. The contract was made in July of 1980 through a broker named Sol Sachs. Tex-Goober never delivered the peanuts because a widespread drought during the summer of 1980 made Spanish Jumbo peanuts (Jumbos) unavailable. The parties dispute whether Tex-Goober offered to substitute Spanish No. 1 peanuts (No. 1's), a slightly smaller peanut often used interchangeably with Jumbos.

Tex-Goober's failure to deliver forced LANUT to cover. By the fall of 1980, when Tex-Goober was supposed to have delivered the Jumbos, the spot market price of peanuts had more than tripled. LANUT covered by entering into a December contract for 219,000 pounds of No. 1's at $1.50 a pound. This order was placed through a broker and, coincidentally, the seller was Tex-Goober. It was not until shipments of No. 1's began arriving, however, that LANUT realized it was dealing with the same supplier that had breached the July 1980 contract for Jumbos.

Although it had just signed a December contract with Tex-Goober for No. 1's at $1.50 per pound, LANUT tried to revive the July contract price. LANUT paid for the

No. 1's by sending Tex-Goober a check for $89,790, along with a letter explaining that the amount was based on a price of $.41 per pound.[1] Tex-Goober cashed the check. Tex-Goober's attorney then wrote to LA-NUT demanding payment of the balance due under the December contract. LA-NUT refused to pay.

In January 1983 Tex-Goober filed suit in state court for fraud and breach of contract against LANUT seeking damages of $238,710, the difference between the purchase price of 219,000 pounds of peanuts at $1.50 per pound and the price at $.41 per pound paid by LANUT. LANUT counterclaimed for $55,080, its damages for Tex-Goober's failure to deliver the remaining 51,000 pounds of Jumbos for which LA-NUT obtained no cover. The case was removed to federal court and tried before a jury. The district court submitted the case to the jury on the following special interrogatories:

1. Do you find from a preponderance of the evidence that Mr. Sachs was notified by Tex-Goober in the fall of 1980 that it had no peanuts to sell or that it had no jumbo peanuts to sell?

     No peanuts  _____
     No jumbo peanuts  _____

2. Do you find from a preponderance of the evidence that check No. 4812 was an accord and satisfaction of L.A. Nut House's debt to Tex-Goober?

     Accord and satisfaction  _____
     No accord and satisfaction  _____

3. What sum, if any, do you find from a preponderance of the evidence, will compensate Plaintiff Tex-Goober for their reasonable attorney's fees?

     $_____

The jury answered the issues "No jumbo peanuts," "No accord and satisfaction," and "$47,742.00," respectively.

LANUT appeals, raising essentially two issues. First, LANUT argues that Tex-Goober's decision to cash LANUT's check created an accord and satisfaction as a matter of law. Second, LANUT argues

that the trial court erred by not submitting an interrogatory to the jury on the issue of custom and usage in the peanut industry. We affirm the jury's finding that there was no accord and satisfaction, and remand for factual determinations on the issue of peanut industry custom.

## II.

LANUT bears the burden of proving the affirmative defense of accord and satisfaction. *Titlow v. Devine,* 650 S.W.2d 143, 144 (Tex.App.1983, no writ). After hearing detailed evidence on the commercial dealings between Tex-Goober and LANUT, the jury concluded that there was no accord and satisfaction, and the trial judge rejected LANUT's motion for JNOV. The jury's factual determination on the issue of accord and satisfaction should not be overturned unless "the facts and inferences point so strongly and overwhelmingly in favor of one party that ... reasonable men could not arrive at a contrary verdict." *Flowers v. Diamond Shamrock Corp.,* 693 F.2d 1146, 1151–52 (5th Cir.1982) (quoting *Boeing v. Shipman,* 411 F.2d 365, 374 (5th Cir.1969) (en banc)).

The Texas Supreme Court has strictly interpreted the burden of proving an accord and satisfaction.

> There must be an unmistakable communication to the creditor that tender of the lesser sum · is upon the condition that acceptance will constitute satisfaction of the underlying obligation.... [T]he statement accompanying the tender of a sum less than the contract price must be so clear, full and explicit that it is not susceptible of any other interpretation.

*Jenkins v. Henry C. Beck Co.,* 449 S.W.2d 454, 455 (Tex.1969) (Citations omitted).

Despite their protestations to the contrary, LANUT's letter to Tex-Goober was not so clear as to be "unmistakable." The letter stated:

---

1. The original July 1980 contract was for Jumbos at $.42 per pound. The price of No. 1's is normally three to five cents less than that for

Jumbos. Thus by reference back to the July contract, LANUT estimated that $.41 per pound would be a more than fair price for No. 1's.

Enclosed is a copy of the sales memorandum from Nick Sachs & Company, stipulating that Los Angeles Nut House had purchased six (6) 45,000 lb. truckloads of Jumbo Spanish Peanuts at $.42 per lb.

California Peanut Company, is a D/B/A of Los Angeles Nut House and as such, we are paying you for the Peanuts received at the price, that the Peanuts were purchased at in July 22, 1980.

Enclosed, is our check in the amount of $89,790.00 for payment of the following invoices:

| | | |
|---|---|---|
| 3748 | - | 46,000 lbs. |
| 3755 | - | 40,000 lbs. |
| 3760 | - | 20,000 lbs. |
| 3763 | - | 45,000 lbs. |
| 3770 | - | 45,000 lbs. |
| received 1/21 | - | 23,000 lbs. |
| TOTAL | | 219,000 lbs. at $.41 = $89,790.00 |

The sales confirmation stipulated Jumbo # 1 Spanish Peanuts and we received # 1 Spanish and the price difference between the two was one cent per pound.

■ The jury was entitled to find that the letter fell short of the mark in two respects. First, the letter does not indicate that the accompanying check was being tendered in "full satisfaction" of a disputed claim. Although LANUT was not required to use the specific phrase "full satisfaction," "the condition that tender is in full settlement *must* be brought home to the creditor." *Roylex, Inc. v. S & S Engineers, Inc.*, 592 S.W.2d 59, 60 (Tex.Civ.App. 1979 no writ) (emphasis added); see also *George Linskie Co. v. Miller-Picking Corp.*, 463 S.W.2d 170, 172 (Tex.1971) (letter failed to indicate that the "plaintiff should not cash the check unless plaintiff was willing to accept it in full settlement").

Second, the letter does not establish why payment of a July contract price for Jumbos should be accepted in full satisfaction of a December contract for the delivery of No. 1's. The July and December contracts were for two different kinds of peanuts, sold at dramatically different prices, and it was not obvious why the price of one should be substituted for the other. We cannot say that LANUT's letter was so "unmistakable" as to create an accord and satisfaction as a matter of law.

### III.

By the time this case reached the jury, the contentions of both parties had narrowed considerably. LANUT's argument was reduced to a contention that Tex-Goober failed to substitute No. 1's for Jumbos under the July contract. Tex-Goober responded by arguing that it offered to substitute No. 1's, but that LANUT never responded to the offer. In the alternative, Tex-Goober asserted that it had no duty to substitute.

LANUT's contention was narrowed to the issue of substitution of No. 1's because the President of LANUT testified that the drought made it impossible to buy Jumbos. After hearing this concession, Judge Parker questioned the attorneys as to what precise factual issues remained for the jury to decide, wondering aloud that "it appears . . . there are no factual disputes in this case." Mr. Hurst, counsel for LANUT, responded that there was a disputed factual issue as to the exact conversation between Tex-Goober and Sol Sachs, the broker. When asked the legal consequences of this conversation, Mr. Hurst explained that it raised the issue of Tex-Goober's duty to substitute.[2] Judge Parker then

2. The following discussion then took place between Judge Parker, Mr. Hurst, and Mr. McMahon, counsel for Tex-Goober:

THE COURT: Now, Mr. Hurst, address the legal consequences of a dispute, factual dispute, that centers around the conversation between Sachs and the seller and the buyer.

MR. HURST: Your honor, Mr. Sachs will testify that Mr. Traylor [Vice President of Tex-Goober] never offered to substitute No. 1 Spanish Peanuts for the Jumbo Spanish Peanuts he owed Los Angeles Nut House under the contract.

THE COURT: Is that disputed?

MR. McMAHON: Your Honor,—

THE COURT: That Traylor never offered to substitute?

MR. McMAHON: Your Honor, yes, sir, we say that he did, but the legal consequences had no affect in this case because of UCC 2615.

THE COURT: Go ahead.

asked whether LANUT was claiming that Tex-Goober committed any other breaches, and Hurst replied in the negative.[3]

██ As part of this exchange, Tex-Goober raised the defense of impossibility of performance under Section 2.615 of the Texas Business & Commercial Code (Vernon 1986). As we analyze the case, however, impossibility of performance was no longer an issue. As explained above, the conceded unavailability of Jumbos meant that LANUT's only complaint against Tex-Goober was its failure to substitute No. 1's. Tex-Goober, on the other hand, conceded that No. 1's were available and claims to have offered to substitute. Impossibility was therefore not an issue because LANUT focused only on the substitution of No. 1's and Tex-Goober conceded their availability.

██ The pivotal question remaining was whether or not industry custom required Tex-Goober to substitute No. 1's when Jumbos became unavailable. Although LANUT requested that a special interrogatory be submitted to the jury on custom and usage of trade, Judge Parker denied the request. Instead, Judge Parker asked the single question: "Do you find from a preponderance of the evidence that Mr. Sachs was notified by Tex-Goober in the fall of 1980 that it had no peanuts to sell or that it had no Jumbo peanuts to sell?" We conclude that this interrogatory was insufficient to resolve the remaining disputed factual issues. Just because the jury found that Tex-Goober told Sachs that it had "no Jumbo peanuts" does not resolve the question of whether Tex-Goober fully satisfied its duties under the July contract. The question of substitution remains. The

district court abused its discretion by not submitting LANUT's special interrogatory on custom and usage in the peanut industry. *Dreiling v. General Electric Co.*, 511 F.2d 768 (5th Cir.1975).

On remand, two factual issues must be resolved. The first issue is whether or not Tex-Goober actually offered to sell No. 1's to LANUT in substitution for Jumbos under the July contract. It is undisputed that LANUT walked away from the July contract after communicating with its broker. If Tex-Goober actually told the broker that it was offering No. 1's in substitution for Jumbos, then it fully discharged its obligations under the July contract.

On the other hand, if the factfinder determines that Tex-Goober did not offer to substitute No. 1's, then the second fact issue is triggered: whether industry custom required Tex-Goober to substitute No. 1's. It is undisputed that in the fall of 1980, when the drought made Jumbos unavailable, Tex-Goober had access to No. 1's. LANUT will therefore prevail if industry custom required substitution. If industry custom did not require substitution, however, Tex-Goober will prevail.

In summary, we affirm that part of the judgment on the verdict finding no accord and satisfaction; we reverse the balance of the judgment and remand the case to the district court for further proceedings consistent with this opinion.

AFFIRMED in part; REVERSED in part, and REMANDED.

---

MR. HURST: Your Honor, we believe they do have consequences because the contract that Mr. Traylor had with Los Angeles Nut House was still in effect and Mr. Gendel [President of LANUT] and Mr. Traylor, to some extent, and certainly Mr. Sachs, all will testify that Spanish No. 1's and Spanish Jumbos are very similar peanuts and they're very frequently interchanged in the industry and that if you don't have Jumbos you deliver No. 1's. If you don't have No. 1's, you deliver Jumbos. The facts are going to show that Mr. Traylor just

walked away from this contract all the while selling these No. 1's that could have sent to Los Angeles Nut House and—

THE COURT: You're saying that he had a duty to substitute?

MR. HURST: Yes, sir.

3. Although LANUT also claimed that Tex-Goober breached a duty by misinforming LANUT that it had "no peanuts," that breach is not relevant to the above discussion.